UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

THOMAS ALBERT SOSNOWSKI,

      Plaintiff,

v.                                Case No. 3:20cv5780-MCR-HTC

SHANNON XEUREB, et al.,

      Defendants.

_____/

<u>ORDER and REPORT AND RECOMMENDATION</u>

    This matter is before the Court on (1) Plaintiff Thomas Albert Sosnowski's *pro se* second amended complaint (ECF Doc. 14) seeking to assert claims pursuant to 42 U.S.C. § 1983, and (2) the undersigned's prior Report and Recommendation (ECF Doc. 12) on Plaintiff's first amended complaint (ECF Doc. 8).  Plaintiff paid the full filing fee and, subsequent to the payment, filed a motion to proceed *in forma pauperis*.  ECF Doc. 11.  The matter was referred to the undersigned Magistrate Judge for preliminary screening and report and recommendation pursuant to 28 U.S.C. § 636 and Northern District of Florida Local Rule 72.2(C).

    On November 13, 2020, after screening Plaintiff's first amended complaint (ECF Doc. 8), the undersigned issued a Report and Recommendation (ECF Doc.

12), recommending this action be dismissed because Plaintiff's claims are barred by the statute of limitations and the *Rooker-Feldman* doctrine.

After the Report and Recommendation was issued, Plaintiff filed a second amended complaint (ECF Doc. 14). It appears Plaintiff may not have yet received the Report and Recommendation when he submitted the second amended complaint to prison officials. Although the second amended complaint is not substantively different from the first amended complaint, and is thus subject to dismissal on the same grounds, for the sake of judicial efficiency and because Plaintiff is proceeding *pro se*, the undersigned went ahead and screened the second amended complaint under 28 U.S.C. § 1915A. Thus, the undersigned will vacate the prior Report and Recommendation (ECF Doc. 12) in favor of this Report and Recommendation, which specifically addresses the second amended complaint.

Additionally, the undersigned orders Plaintiff's motion to proceed *in forma pauperis* be DENIED. As stated above, after Plaintiff had already paid the full filing fee, he filed a motion to proceed *in formal pauperis*. The motion is based on Plaintiff's inability to pay for copying costs. *In forma pauperis* status, however, does not entitle a plaintiff to the payment for copies. *See, e.g.*, *F.T.C. v. Lalonde*, 545 F. App'x 825, 833 (11th Cir. 2013) (noting that section 1915 does not cover costs of copies of documents, postage, or legal supplies).

## I.      THE SECOND AMENDED COMPLAINT

Plaintiff, an inmate of the Florida Department of Corrections, currently incarcerated at Jefferson Correctional Institution, brings this action on behalf of himself, his son Roman Sosnowski, and the estate of his deceased mother Katarina Sosnowski.[1]  Plaintiff names the following twelve (12) defendants, some of whom are not state actors but are private citizens and relatives of the Plaintiff's son: (1) Shannon Xeureb (Department of Children and Families ("DCF") Child Protective Investigator); (2) Sarah Peacock (same); (3) Jacquilyn Henry (same); (4) Stacy Amaro (same); (5) Megan Williams (Lakeview Families First Network Child Protective Caseworker); (6) Tom Sefton (Lakeview Center Child Psychological Trauma Therapist); (7) Rebecca Scott (Lakeview of Baptist Hospital Adult Psychiatric Evaluator); (8) Katrina Crane (same); (9) Estate of Gina Garza (deceased biological mother of Plaintiff's son); (10) Brittany Hightower (maternal half-sister and permanent legal guardian of Plaintiff's son); (11) Hilda Tyler (maternal grandmother of Plaintiff's son); and (12) Ray Garza (maternal grandfather of Plaintiff's son).  ECF Doc. 14 at 3–6.

---

[1] Plaintiff does not have standing to assert claims on behalf of either his son or the estate of his mother.  Accordingly, the undersigned does not address claims alleged only on their behalf.  Also, at the time Plaintiff initiated this action, he was at Graceville Correctional Institution.

Plaintiff's second amended complaint consists of thirty-three (33) pages and eighty-one (81) pages of exhibits.[2]   The second amended complaint contains a recitation of disjointed facts and nonsensical allegations, which are difficult to follow and even more difficult to comprehend.  Additionally, in some instances, the second amended complaint contains gratuitous and caustic personal attacks against Defendants.[3]

From what the undersigned can discern, Plaintiff's allegations center on adverse custody decisions rendered in the Santa Rosa County Circuit Court after several DCF shelter hearings.  Plaintiff disagrees with the "no contact" and custody decisions made by the judges in those hearings, and Plaintiff alleges the investigators who were involved conspired with the child's relatives to fabricate evidence against Plaintiff, conceal evidence from the judges, and ignore evidence favorable to Plaintiff.  He contends the DCF hearings and Defendants' conduct violated his constitutional rights as well as those of his "biological and brainwashed son." Plaintiff seeks monetary damages and for this Court to grant him custody of his child.

---

[2] Although Plaintiff's second amended complaint exceeds the page limits set forth in the Court's Local Rules, the undersigned nonetheless screened the second amended complaint as is.

[3] For example, on a child in-home investigation report, attached as an exhibit, Plaintiff writes the investigator "is a lyin' ass piece of shit."  ECF Doc. 14 at 79.  Additionally, Plaintiff includes interview excerpts from a comprehensive assessment conducted by Lakeview Center, Inc., in which Gina Garza, the deceased mother of Plaintiff's son, stated that Plaintiff "taught [their son, Roman,] to call DCF workers 'bitches' and the police 'pigs.'"  Below this statement, Plaintiff writes "[w]ell cared for children HATE their abductors[.]"  *Id.* at 47.  In the same assessment, Garza is also reported as stating "that she want[ed] Roman to be able to maintain a relationship with his father," and Plaintiff handwrites "bullshit!" directly below this statement.  *Id.*

The following facts are taken from Plaintiff's second amended complaint and assumed to be true for purposes of this report and recommendation. Because the recitation of alleged facts contained in the second amended complaint is repetitive and not in any sensible order, the undersigned has attempted to reorganize the allegations here in reverse chronological order, when possible.

On June 9, 2016, at a DCF shelter hearing before Judge Marci Goodman, Plaintiff alleges Defendant Williams deceived Judge Goodman into imposing a permanent no contact order by "commit[ing] straight up perjury by testifying that [Plaintiff] was non-compliant with a DCF safety case plan . . . ." *Id.* at 17–18. Plaintiff alleges his "Confrontation Clause rights were violated" because he could not cross-examine Defendant Williams, and that Plaintiff was "blatantly denied procedural due process rights to attend the hearing." *Id.* at 18. Plaintiff also alleges Judge Marci Goodman "abused the Court's discretion" by imposing the permanent no-contact order. *Id.* at 18.

According to Plaintiff, the events leading up to the June 9, 2016 hearing included three "bogus welfare checks at [Plaintiff's] family's home," which occurred between May 25, 2015, and July 17, 2015, and were led by Defendants Peacock and Amaro. *Id.* at 10. Plaintiff alleges Defendant Tyler made four "separate allegations of abuse or neglect . . . with malicious intention," and a July 20, 2015 DCF report indicated that there was no evidence of child abuse, neglect, or domestic

violence. *Id.* Plaintiff asserts despite a "Florida DCF statute" mandating the initiation of "felony prosecution" for false reports of abuse or neglect, Defendants Peacock and Amaro "violated [Plaintiff's] [Fourteenth] Amendment rights to [e]qual protection [u]nder the [l]aw for refusing to initiate felony prosecution of [Defendant] Tyler for making [four] consecutive allegations of abuse and neglect [that] DCF determined to be false . . . ." *Id.* at 10–11.

By refusing to initiate such a prosecution, Plaintiff asserts Defendants Peacock and Amaro "refuse to protect . . . [Plaintiff's] son and [him] from future human rights atrocities . . . inflicted by . . . Defendants . . . ." *Id.* at 11. Plaintiff alleges that Defendants Peacock and Amaro "actively and deliberately" encouraged Gina Garza and Defendants Hightower and Tyler to make false reports of domestic violence to DCF "WITHOUT ANY FEAR OF CONSEQUENCE, with full custody of [Plaintiff's] son and exclusive use of the home that is only in [Plaintiff's] name AS THE REWARD FOR THE NUMEROUS FELONIES COMMITTED . . . ." *Id.* Plaintiff contends that the Santa Rosa County DCF is "an extremely sexist, man hating organization" because the CPIs in 2015 were "nearly ALL female." *Id.*

Plaintiff also complains about a "warrantless forced seizure" that took place on September 8, 2015, which, as set forth above, initiated the no-contact order. Plaintiff claims the events on that day violated his Fourteenth Amendment rights to family association and Fourth Amendment protection from "unlawful searches and

seizures."[4]  *Id.*  Specifically, Plaintiff alleges Defendant Xeureb "initiated a government created exigency complete with a beyond ridiculous show of extreme police force when she brought TEN!!! DCF assist police officers."  *Id.* at 12. Plaintiff asserts Defendant Xeureb accepted and encouraged false domestic violence reports from Defendant Tyler and ignored many "exculpatory facts," such as information in a July 20, 2015 DCF report relating to testimony from Defendant Hightower and Gina Garza, *id.* at 24–25, and the fact that there were "absolutely no reports of child abuse, child neglect, or reckless child endangerment . . . ." *Id.* at 12. Plaintiff alleges Defendants violated his son's Eighth Amendment protections against cruel and unusual punishment by exposing him to extreme psychological trauma, as Plaintiff's son was "only [three] feet away and watch[ed] the SWAT [t]eam brutally bludgeon his beloved father to the point [Plaintiff's] beloved son thought his beloved father was dead with a pool of blood next to his beloved father's head." *Id.* at 23.

Plaintiff alleges Defendant Xeureb "had the full knowledge that [Plaintiff] always took very good care of [his] son" as well as "the full knowledge that [Plaintiff never] threatened to dismember DCF CPIs" during any of the welfare checks.  *Id.* at

---

[4] The Court takes judicial notice that Plaintiff is currently serving two five-year (5) sentences, running consecutively, after being found guilty of one count of assaulting an officer and one count of resisting arrest with force arising out of the events that occurred on September 8, 2015.  *See State of Florida v. Sosnowski*, 2015 CF 001155, First Judicial Circuit, Santa Rosa County, https://www.civitekflorida.com/ocrs/app/caseinformation.xhtml?query=TlWAm_Q_GE9tCZWm8UNE7nNcaRch3ivh4Mm7a_SlgrM&from=caseSearchTab.

13.   Yet, Defendant Xeureb concealed this knowledge from the DCF officers and the "SWAT Team, while fabricating false allegations of abuse," to deceive the officers into "conducting an unlawful and extremely brutal warrantless forced seizure of [Plaintiff's] son with absolutely no exigent circumstances . . . ." *Id.* at 14. Plaintiff contends Defendant Xeureb cannot prove she had "reasonable cause to believe that [Plaintiff's] son was actually in serious danger . . . ." *Id.*

Plaintiff further alleges Defendant Xeureb continued to violate his Fourteenth Amendment rights the following day, on September 9, 2015, at a DCF shelter hearing by "'sheltering' [Plaintiff's] son from [him] and imposing a [n]o [c]ontact [o]rder[,] . . . which turned into a permanent [n]o [c]ontact [o]rder in a June 9, 2016 EX PARTE DCF [s]helter hearing." *Id.* at 15.  Defendant Xeureb allegedly withheld exculpatory facts—the same facts that she allegedly withheld from the officer assist team on the day of the seizure—from Judge Marci Goodman "to deceive Judge Marci Goodman into 'sheltering' [Plaintiff's] son from [him] and imposing a [n]o [c]ontact [o]rder." *Id.*

Plaintiff alleges Defendant Xeureb violated his son's Eighth Amendment protections against cruel and unusual punishment by deceiving Judge Goodman into giving full custody of Plaintiff's son to his now deceased mother Gina Garza. *Id.* at 18–19.  He contends Defendants "went through such great lengths to organize the

bogus [September] 8, 2015 DCF welfare check," and Defendants do not want Plaintiff to reveal their actions to Plaintiff's son. *Id.* at 27–28.

Plaintiff asserts Gina Garza was "an extremely unfit mother seeking full custody of [Plaintiff's] son for financial gain" and was "a suicidal, extreme chronic alcoholic with advanced stage cirhossis [sic] of the liver [who] was Baker Acted for alcohol related psychosis . . . ." *Id.* at 16. He also alleges she gave the son ADHD medication because the son was easier to manage "ALL DOPED UP." *Id.* at 21. Plaintiff alleges after he informed Judge Goodman that Gina Garza was a "Baker Acted fall on her face drunk," Judge Goodman ordered the state take custody of Plaintiff's son despite the fact that Plaintiff was released on bond from October 26, 2015, through June 9, 2016. *Id* at 19. Plaintiff also alleges "ALL these Defendants deliberately destroyed the beautiful relationship between [Plaintiff's] son and [him] . . . to get Gina Garza unlawfully awarded full custody . . . ." *Id.* at 27.

Plaintiff explains that Judge Goodman allowed Plaintiff to have "[t]herapeutic [v]isitation rights between November 24, 2015[,] and June 8, 2016 . . . ." *Id.* at 16. However, Plaintiff asserts that Defendants Williams and Sefton "deliberately conspired with DCF to make sure that [Plaintiff's son]" never sees Plaintiff again. *Id*. Plaintiff asserts his "son and [his] mother visited each other [six] or less times between [September] 8, 2015[,] and July 9, 2019, the date of [his] mother's death."

*Id.* Plaintiff takes issue with the fact that during these visits, neither Plaintiff's son nor Plaintiff's mother were allowed to discuss Plaintiff. *Id.*

Plaintiff also references a March 17, 2016 DCF shelter hearing, in which Defendant "Sefton committed straight up perjury by testifying that [Plaintiff's] son fears [Plaintiff] and does not want to see [Plaintiff] . . . ." *Id.* at 17. Plaintiff asserts his "Confrontation Clause rights" were violated because Plaintiff's son did not testify, so Plaintiff did not have an opportunity to cross-examine his son so that his son "could expose ALL my accusers of being bold faced liars deserving extreme embarrassment." *Id.* at 17.

Plaintiff alleges Gina Garza and Defendants Hightower, Ray Garza, and Tyler conspired with either Defendant Xeureb or Williams to violate Plaintiff's Fourteenth Amendment rights to family association. *Id.* at 23. To support this claim, Plaintiff repeats the allegations described above regarding false domestic violence claims, the withholding of exculpatory information from the SWAT team and Judge Goodman, and Defendants Peacock and Amaro's obligation to initiate felony prosecution of Defendant Tyler. *Id.* at 23–26. Plaintiff also asserts that Defendant Ray Garza was the "mastermind of the full custody of the child for Gina Garza false domestic violence claims," and that Defendant Ray Garza conspired with DCF to relocate Plaintiff's son to Arizona. *Id.* at 26.

With regard to Defendant Scott, Plaintiff alleges she "conspired with DCF . . . by fabrications of and by the behest of DCF, deliberately gave [Plaintiff] the false mental disorder diagnosis of Schizophrenia . . . ." *Id.* at 28.  Plaintiff cites various facts, which he alleges are an indication that Defendant Scott violated the "Goldwater Rule." *Id.*  For instance, Plaintiff claims that nobody "has ever called the police on [him] . . . until Defendant Hilda Tyler called the police on [him] when Hilda Tyler even calls the police on her dear husband . . . every once in a while." *Id.* at 29.  Plaintiff notes that he "never committed an unjustified act of violence." *Id.*

With regard to Defendant Crane, Plaintiff alleges she conspired with Defendant Williams by giving Plaintiff "the same exact false mental disorder diagnosis of schizophrenia spectrum disorder and other psychotic disorders on November 3, 2015 . . . ." *Id.*  Like Defendant Scott's findings, Plaintiff takes issue with the facts that form the basis of Defendant Crane's findings.  Plaintiff states Defendants Scott and Crane "greatly contributed . . . to Judge Marci Goodman['s] imposing the permanent [n]o [c]ontact [o]rder . . . in the June 9, 2016 EX PARTE DCF shelter hearing . . . ." *Id*. at 30.

Based on the allegations mentioned above, Plaintiff seeks: (1) "large monetary compensation"; (2) "U.S. Department of Justice investigation by the Public Trust Unit of the bogus [September] 8, 2015 DCF welfare check and criminal prosecution of [Defendant] Xeureb"; (3) "[c]riminal prosecution of Brittany Hightower and

Hilda Tyler"; and (4) "frequent contact and frequent unsupervised visitations between [Plaintiff] and [Plaintiff's son] while [Plaintiff] is still in [p]rison and the IMMEDIATE granting of full custody of [Plaintiff's son] to [Plaintiff] upon release from [p]rison."[5]  *Id.* at 32.

## II.    LEGAL STANDARD

Because Plaintiff is a prisoner seeking relief against governmental employees, the Court is required to review his complaint, identify cognizable claims, and dismiss the complaint, or any portion thereof, if it "(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief."  28 U.S.C. § 1915A(b).

Dismissals for failure to state a claim are governed by the same standard as Federal Rule of Civil Procedure 12(b)(6).  *See Mitchell v. Farcass*, 112 F.3d 1483, 1485 (11th Cir. 1997).  To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."

---

[5] Plaintiff's request for an investigation into the Defendants or criminal prosecution of the Defendants are not the types of relief this Court can grant even if Plaintiff's claims were not otherwise barred.  "The decision of whether to investigate, arrest, or prosecute government officers or officials is within the discretion of the United States Attorney; a decision in which the court will not interfere."  *Crutcher v. Bolling*, No. 2:16-cv-1422-KOB-JHE, 2017 WL 2962358, at \*5 (N.D. Ala. May 18, 2017), *report and recommendation adopted sub nom. Peara Crutcher v. Bolling*, No. 216-cv-1422-KOB-JHE, 2017 WL 2960534 (N.D. Ala. July 11, 2017).  Also, a private citizen has no "judicially cognizable interest in the prosecution or non-prosecution of another."  *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973); *see also Williams v. Univ. of Ala. Hosp. at Birmingham*, 353 F. App'x 397, 398 (11th Cir. 2009) ("The government, not private citizens, prosecutes crimes.").  Thus, Plaintiff cannot compel the criminal prosecution of another by filing a civil complaint.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  To state a plausible claim for relief,

plaintiffs must go beyond merely pleading the sheer possibility of unlawful activity

by a defendant; plaintiffs must offer factual content that allows the Court to draw the

reasonable inference that the defendant is liable for the misconduct alleged.  *Id.*

Additionally, because Plaintiff is proceeding *pro se*, the undersigned will liberally

construe his allegations.  *Haines v. Kerner,* 404 U.S. 519, 520–21 (1972); *Bingham*

*v. Thomas*, 654 F.3d 1171, 1175 (11th Cir. 2011).

## III.  DISCUSSION

As an initial matter, and even when construing Plaintiff's allegations liberally,

Plaintiff's second amended complaint fails to meet the basic pleading requirements

set forth in Federal Rule of Civil Procedure 8.  Under Rule 8(a), a "pleading that

states a claim for relief must contain: (1) a short and plain statement of the grounds

for the court's jurisdiction . . . [and] (2) a short and plain statement of the claim

showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(1)–(2).  "The point

is to give the defendant fair notice of what the claim is and the grounds upon which

it rests." *Harrison v. Benchmark Elecs. Huntsville, Inc.*, 593 F.3d 1206, 1214 (11th

Cir. 2010).  A pleading where "it is virtually impossible to know which allegations

of fact are intended to support which claim(s) for relief" does not comply with that

standard. *Peavey v. Black*, 476 F. App'x 697, 699 (11th Cir. 2012) (citing *Anderson*

*v. Dist. Bd. of Trs. of Ctr. Fla. Cmty. Coll.*, 77 F.3d 364, 366–67 (11th Cir. 1996).

Here, as illustrated above, Plaintiff's second amended complaint is a jumbled mess of facts that jump from one event to another. It is unclear which allegations support which claims. His allegations of wrongdoing are conclusory and thus insufficient to meet the pleading requirements. *See Douze v. Stamen*, 2018 WL 4360622, at *4 (M.D. Fla. Sept. 13, 2018) ("[Plaintiff's] self-serving, conclusory statement amounts to no more than a 'naked assertion,' which fails to satisfy the pleading standard."). Additionally, in many instances, Plaintiff improperly lumps all twelve defendants together without making it clear who did what and when. *See West Coast Roofing & Waterproofing, Inc. v. Johns Manville, Inc.*, 287 Fed. App'x. 81, 86 (11th Cir. 2008) (noting that in a case with multiple defendants, plaintiff should avoid "lumping" multiple defendants together because doing so makes it difficult to "ascertain exactly what the plaintiff is claiming").

Normally, when a complaint fails to meet Rule 8 standards, the Court will allow a plaintiff an opportunity to amend. In this case, however, the undersigned finds an additional opportunity to amend to be futile. *Rance v. Winn*, 287 F. App'x 840, 841 (11th Cir. 2008) ("[D]istrict courts need not permit amendment where it would be futile to do so."). This is so because the deficiencies with the second amended complaint are incurable. As discussed below, Plaintiff's claims are barred by the *Rooker-Feldman* doctrine and the statute of limitations.

### A.    The *Rooker-Feldman* Doctrine

As stated above, at the crux of Plaintiff's claims is his discontent with the state court's custody decisions, which resulted in Plaintiff losing the ability to be with his son.  Plaintiff seeks not only damages arising out of those decisions and the conduct that led to those decisions, but also to have this Court reverse those decisions. Regardless of whether Plaintiff is attempting to assert a due process claim or malicious prosecution claim[6] based on the loss of custody of his son and the events leading up to that loss, this Court does not have jurisdiction to undo the state court's decisions or adjudicate matters that are inextricably intertwined with those decisions.

Under the *Rooker-Feldman* doctrine,[7] federal courts may not exercise jurisdiction over "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005); *see also Brown v. R.J.*

---

[6] As an additional matter, Plaintiff's claim for malicious prosecution fails on its merits because Plaintiff cannot allege facts sufficient to meet the elements of such a claim.  Namely, he cannot allege that the state court proceedings terminated in his favor, an element of a malicious prosecution claim in Florida.  *See Kingsland v. City of Miami*, 382 F.3d 1220, 1234 (11th Cir. 2004), *abrogated on other grounds*, *Doe by next friend Doe v. Leach*, 2020 WL 5814371 (Sept. 30, 2020) (citing *Durkin v. Davis*, 814 So. 2d 1246, 1248 (Fla. 2d DCA 2002)).

[7] The doctrine arises from two cases:  *Rooker v Fidelity Trust Co.*, 263 U.S. 413 (1923), in which the United States Supreme Court noted district courts only possess original jurisdiction and, thus, the United States Supreme Court is the only federal court that can hear an appeal of a state court judgment, and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983), in which the Supreme Court later re-affirmed its earlier decision.

*Reynolds Tobacco Co.*, 611 F.3d 1324, 1330 (11th Cir. 2010) (quoting *Johnson v. De Grandy*, 512 U.S. 997 (1994)) ("The doctrine bars the losing party in state court 'from seeking what in substance would be appellate review of the state judgment in a United States district court, based on the losing party's claim that the state judgment itself violates the loser's federal rights.'").

"The doctrine is a jurisdictional rule that precludes the lower federal courts from reviewing state court judgments." *Alvarez v. Attorney Gen. for Fla.*, 679 F.3d 1257, 1262 (11th Cir. 2012) (citation omitted). The doctrine "operates as a bar to federal court jurisdiction where the issue before the federal court was 'inextricably intertwined' with the state court judgment so that (1) the success of the federal claim would 'effectively nullify' the state court judgment, or that (2) the federal claim would succeed 'only to the extent that the state court wrongly decided the issues.'" *Id.* at 1262–63 (quoting *Casale v. Tillman*, 558 F.3d 1258, 1260 (11th Cir. 2009)).

In determining whether the *Rooker-Feldman* doctrine applies, this Court considers whether: "(1) the party in federal court is the same as the party in the state court; (2) the prior state court ruling was a final or conclusive judgment on the merits; (3) the party seeking relief in federal court had a reasonable opportunity to raise its federal claims in the state court proceeding; and (4) the issue before the federal court was either adjudicated by the state court or was inextricably intertwined with the state court judgments. *Storck v. City of Coral Springs*, 354 F.3d 1307, 1310

n.1 (11th Cir. 2003) (quoting *Amos v. Glynn County Board of Tax Assessors*, 347 F.

3d 1249, 1265 (11th Cir. 2003)).  The Eleventh Circuit has further defined the

"inextricably intertwined" requirement as the situation when a "federal claim

succeeds only to the extent that the state court wrongly decided the issues before."

*Goodman ex rel Goodman v. Sipos*, 259 F.3d at 1332 (quoting *Siegel v LePore*, 234

F.3d 1163, 1172 (11th Cir. 2000) (en banc)).

Each of those elements are met here:  (1) Plaintiff was a party in the state court

DCF shelter hearings; (2) the hearings he contests resulted in a final or conclusive

determination regarding the custody of his son; (3) Plaintiff could have raised his

federal constitutional claims in those proceedings; and (4) the issues Plaintiff

presents in his second amended complaint were either adjudicated by the state court

or inextricably intertwined with the state court's custody decisions.  Indeed, the relief

Plaintiff seeks from this Court—frequent contact and unsupervised visitations with

his son while he is in prison and full custody once he is out of prison—would be a

complete reversal of the state court's custody determinations.  *See, e.g.*, *Staley v.*

*Ledbetter*, 837 F.2d 1016, 1018 (11th Cir. 1988) (affirming the district court's

dismissal of section 1983 complaint asserting claims of due process violations for

lack of jurisdiction where plaintiff sought "reinstatement of parental custody and

psychiatric care at state expense for her children and herself"); *Bator v. Shelton*,

2008 WL 11469574, at *2 (M.D. Fla. Nov. 26, 2008) ("Here, the Plaintiff alleges

that Judge Steinbeck and DCF violated his daughters constitutional rights by depriving her of her right to see her father.  However, the Court has no jurisdiction over the state court's custody determinations.").

The fact that Plaintiff is also seeking other relief, including monetary damages, does not make *Rooker-Feldman* any less applicable.  In *Goodman ex rel. Goodman v. Sipos*, 259 F.3d 1327 (11th Cir. 2001), the Eleventh Circuit specifically addressed, for the first time, the applicability of the doctrine to claims of constitutional violations arising from dependency proceedings seeking damages rather than injunctive relief.  In so doing, the court held that *Rooker-Feldman* barred the plaintiff's claim that the defendant DCF employee's affidavit was false and that the state court proceedings violated plaintiffs' due process rights.  *Id.* at 1331–1335. The court determined that those claims "strike at the heart of the state court's proceedings and judgment" and that they succeed "only to the extent that the state court wrongly decided" the custody issue.  *Id.* at 1334.  Thus, the fact that monetary damages were sought rather than injunctive relief was irrelevant because "[t]he *Rooker-Feldman* doctrine is broad enough to bar all federal claims which were, or should have been, central to the state court decision, even if those claims seek a form of relief that might not have been available from the state court."  *Id.* at 1333.

There can be no doubt here that all the allegations in Plaintiff's second amended complaint, on which Plaintiff bases his claim for monetary relief, involve

conduct that was at the heart of the state court proceedings and, indeed, that occurred at the state court proceedings. For Plaintiff to succeed on his claims that Defendants fabricated evidence or withheld evidence, this Court would have to find that the state court's decisions were incorrect. Those were, in fact, the same types of allegations that were alleged in *Goodman* and *Bator*.[8] "A claim that at its heart challenges the state court decision itself—and not the statute or law which underlies that decision—falls within the doctrine because it complains of injuries caused by state-court judgments and invites review and rejection of those judgments." *May v. Morgan Cty.*, 878 F.3d 1001, 1005 (11th Cir. 2017) (internal quotation marks omitted). In other words, Plaintiff's attack on the hearing process and investigation "invites review and rejection of" the state court custody decisions. *Hansen v. Florida*

---

[8] *See also, e.g.*, *Sample v. Monterey Cnty. Family & Children Servs.*, 2009 WL 2485748, at *3 (N.D. Cal. 2009) ("Although [plaintiff] asks for monetary damages, she would only receive a damage award if this court determined that the Dependency Court's decisions pertaining to the custody of her children—including any review or authorization of defendants' actions—were in error. Accordingly, to evaluate her claims and grant her the relief she requests, this court would have no choice but to review and reject the state Dependency Court's decision . . . ."); *Grimes v. Alameda County Social Servs.*, 2011 WL 4948879, at *3 (N.D. Cal. Oct. 18, 2011) ("Even if plaintiff were to abandon his request for the return of his children and instead pursue only money damages, his claims still would require review of the relevant state-court decisions. Such review is barred. Even though plaintiff nominally asserts claims for alleged civil rights violations, his pleading is de facto an improper collateral attack on unfavorable state-court rulings."); *Doe v. Spears*, 393 F. Supp. 3d 123, 134 (D. Mass. 2019) (applying *Rooker-Feldman* because the viability of plaintiff's claim "depends, therefore, on the conclusion that the Juvenile Court wrongly concluded that there was sufficient evidence to warrant the removal and separation of his children").

*Comm'n of Offender Review*, No. 20-10761 (November 10, 2020)*, citing *May*, 878 F.3d at 1005.

Moreover, although the court in *Goodman* found that plaintiff's claim based on an illegal search was not barred by *Rooker-Feldman*, the Court noted that "the allegedly illegal search of the plaintiffs' home occurred several days before the state custody proceeding was initiated, and no evidence or other information derived from the search was introduced in the state court proceedings or was relied upon by the court when it decided to take away Goodman's custody of Michael." *Id.* at 1334. Thus, "no issue involving the search was or could have been raised in the custody proceeding." *Id.*

Unlike the search in *Goodman*, the alleged "warrantless forced seizure" that occurred in September 2015 is what Plaintiff alleges led to the DCF hearing that occurred the following day and what Plaintiff alleges turned into a permanent no-contact order in June 2016. Plaintiff further alleges that Defendant Xeureb withheld facts from the officers that day, the same facts that were withheld from Judge Goodman. Thus, unlike the plaintiff in *Goodman*, Plaintiff could have raised issues involving the seizure in the custody proceeding.

Thus, this Court lacks jurisdiction to hear this matter. *See Wood v. Orange County*, 715 F.2d 1543, 1546 (11th Cir. 1983), *cert. denied*, 467 U.S. 1210 (1984) ("[Because] federal review of state court decisions is entrusted solely to the Supreme

Court, [the lower federal courts] may not decide federal issues that are raised in state proceedings and 'inextricably intertwined' with the state court's judgment.").

### B.    Statute of Limitations

Even were the Court to determine that it has jurisdiction over Plaintiff's claims, the claims would nonetheless be barred by the statute of limitations because it was brought more than four (4) years after the "bogus welfare checks," the "seizure" of Plaintiff's son, and the shelter hearings.

"Claims brought pursuant to 42 U.S.C. § 1983 are subject to the statute of limitations period governing personal injury actions in the state where the action is brought." *Wellons v. Comm'r, Ga. Dep't of Corr.*, 754 F.3d 1260, 1263 (11th Cir. 2014) (citing *Crowe v. Donald*, 528 F.3d 1290, 1292 (11th Cir. 2008)). The Eleventh Circuit has "held that the four-year statute of limitations under Fla. Stat. § 95.11(3) applies to § 1983 claims arising in Florida." *Ellison v. Lester*, 275 F. App'x 900, 901–902 (11th Cir. 2008) (citing *Chappell v. Rich*, 340 F.3d 1279, 1283 (11th Cir. 2003)).

"[T]he accrual date of a §1983 claim, from which the statute of limitations begins to run, is determined by federal law." *Tillman v. Orange Cty., Fla.*, 519 F. App'x 632, 635 (11th Cir. 2013) (citing *Wallace v. Kato*, 549 U.S. 384, 388 (2007)). "The statute of limitations on a section 1983 claim begins to run when 'the facts which would support a cause of action are apparent or should be apparent to a

person with a reasonably prudent regard for his rights.'" *Van Poyck v. McCollum*, 646 F.3d 865, 867 (11th Cir. 2011) (citing *McNair v. Allen*, 515 F.3d 1168, 1173 (11th Cir. 2008)). Thus, an action under section 1983 does not accrue until: (1) "plaintiff knows or has reason to know that he has been injured"; and (2) "plaintiff is aware or should have been aware who has inflicted the injury." *Mullinax v. McElhenney*, 817 F.2d 711, 716 (11th Cir. 1987) (citations omitted).

As summarized above, Plaintiff complains of events that took place in 2015 and 2016. As alleged by Plaintiff, his constitutional rights were violated during the "bogus welfare checks" that occurred in 2015, the DCF hearings that occurred in 2015 and 2016, and the "warrantless force seizure" of his son that occurred in 2015. Thus, Plaintiff's claim accrued in 2015 and, at latest, by June 9, 2016, when the "no contact" order became permanent.[9] *See Allen v. Dekalb Cty. Jail's Med. Providers/Private Contractors*, 632 F. App'x 593, 594 (11th Cir. 2016) (holding plaintiff "did not need to be aware of the extent of his injury for the statute of limitations to begin running").

Plaintiff, however, did not file this action until August 26, 2020, when he delivered his initial complaint to Graceville CI mail officials. Thus, Plaintiff's claims are time-barred.

---

[9] Although Plaintiff also mentions a shelter hearing that took place in June 2020, by Judge Ross Goodman, and complains about Judge Goodman's handling of that hearing, he has not alleged any claims arising out of that hearing, and Judge Goodman is not a defendant in this action.

## IV.   CONCLUSION

For the reasons set forth above, the undersigned recommends Plaintiff's claims be dismissed for failure to state a claim *sua sponte*, prior to service, and without leave to amend.  The fact that Plaintiff has paid the full filing fee does not alter this analysis.  *See Tate v. Burke*, 131 F.R.D. 363, 365 (D.C. 1990) (applying section 1915's frivolity standard to a *pro se* complaint even though plaintiff was not proceeding *in forma pauperis* and dismissing the action *sua sponte*).  Indeed, an "early evaluation of the potential merits of a pro se litigant's claim is very important because initial screening by the court can eliminate patently frivolous actions." *See, e.g.*, *Gonzalez v. Citicorp Credit Srvcs., Inc.*, 2015 WL 13776794 (S.D. Fla. May 18, 2015), *adopting report and recommendation*, 2015 WL 13776795 (June 22, 2015).

Also, because Plaintiff will be afforded an opportunity to file an objection to this Report and Recommendation, a *sua sponte* dismissal is appropriate.  *See Tazoe v. Airbus S.A.S.*, 631 F.3d 1321, 1336 (11th Cir. 2011) (citations and internal quotations marks omitted) ("[A] district court can only dismiss an action on its own motion as long as the procedure employed is fair. . . . To employ fair procedure, a district court must generally provide the plaintiff with notice of its intent to dismiss or an opportunity to respond."); *Anderson v. Dunbar Armored, Inc.*, 678 F. Supp. 2d

1280, 1296 (N.D. Ga. 2009) (noting that R & R served as notice that claims would be *sua sponte* dismissed).

Accordingly, it is ORDERED:

1.    The Report and Recommendation at ECF Doc. 12 is VACATED.

2.    Plaintiff's motion to proceed *in forma pauperis* (ECF Doc. 11) is DENIED.

It is also respectfully RECOMMENDED:

1.    Plaintiff's second amended complaint (ECF Doc. 14) be dismissed under 28 U.S.C. § 1915A.

2.    The clerk be directed to close the file.

Done in Pensacola, Florida, this 15th day of December, 2020.

*/s/ Hope Thai Cannon*

**HOPE THAI CANNON**
**UNITED STATES MAGISTRATE JUDGE**

<u>NOTICE TO THE PARTIES</u>

Objections to these proposed findings and recommendations must be filed within **fourteen (14) days** of the date of the Report and Recommendation. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control.</u>  An objecting party must serve a copy of its objections upon all other parties.  A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.